UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BRENDA T., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18 CV 120 JMB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner of Operations, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act"). The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff's application for Disability Insurance Benefits. All matters are pending before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c). The matter is fully briefed, and for the reasons discussed below, the decision is affirmed.

## Procedural History

On January 27, 2015, Plaintiff filed an application for Disability Insurance Benefits ("DIB") under the Act. Plaintiff alleged a disability onset date of October 31, 2011. (Tr. 15) Plaintiff's application was denied initially on June 30, 2015, and she thereafter requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 12, 2017.

Plaintiff appeared with counsel for the hearing. Plaintiff testified concerning her impairments, daily activities, functional limitations, and past work. Gary F. Weimholt, a vocational expert, also testified at the hearing. In a written decision dated April 7, 2017, the ALJ

denied Plaintiff's application for benefits.  On December 7, 2017, the Appeals Counsel for the Administration denied Plaintiff's request for review.  Therefore, the ALJ's decision stands as the final decision of the Administration in this matter.  Accordingly, Plaintiff has exhausted her administrative remedies and the matter is properly before this Court.

**Administrative Record**

## I.     General

Plaintiff filed for DIB benefits, alleging a disability onset date of October 31, 2011. Plaintiff's date last insured was December 31, 2013.  (Tr. 15)  Plaintiff was 58 years old on her date last insured and 61 years old at the time of her hearing before the ALJ.  (Tr. 23)  Prior to her alleged disability, Plaintiff worked at a family-owned funeral home in a capacity that combined or included work characterized as a funeral attendant and an administrative assistant.  (Id.)  After a divorce, Plaintiff left the funeral home business and worked as a membership solicitor and attendant for a gym.  (Id.)  As the record in this matter makes clear, Plaintiff's health declined in several respects after her date last insured.

In her Disability Report – Adult (Tr. 290-300), Plaintiff's medical conditions are listed as follows:  herniated discs, spinal stenosis, degenerated hip, disorder of sacrum, bursitis disorder, severe glaucoma, macular degeneration, and arthritis.   (Tr. 291)

## II.     Summary – Pertinent Medical Records and Opinion Evidence

There is a great deal of medical evidence in the record.  The Court has fully considered the entire record, but summarizes and discusses only specific aspects herein to provide context for this memorandum and order.

### A.     Pain Diagnoses, Treatment, and Management

The administrative record includes a substantial volume of medical records documenting Plaintiff's treatment for back and hip pain during the time period between late 2011 and the end

of 2013.[1]  Although Plaintiff was treated by several different physicians and providers, the record indicates that Dr. Hugh Berry was the primary physician who addressed Plaintiff's back and hip pain during the time period at issue herein.

The record indicates that, throughout 2012, Plaintiff received conservative care in the form of medication management and interventional care in the form of injections.  The record further indicates that this treatment program provided substantial, but not complete, pain relief.  In early February 2012, Dr. Berry's notes indicate that Plaintiff had hip and back pain and was in moderate distress.  Dr. Berry recommended conservative care with medications and injections for pain relief.  (Tr. 508, 611)  Treatment notes from March 7, 2012, indicate that Plaintiff received injection treatment as recommended earlier.  (Tr. 535, 921)  When she was seen for follow-up on June 4, 2012, Plaintiff was in moderate distress.  The treatment notes indicate conservative care, medication refills, and that injections had provided some improvement.  (Tr. 505, 622)  On June 13, 2012, Plaintiff received caudal epidural and trochanteric bursa injections.  (Tr. 546, 938)  Records from June 20, 2012, refer to an MRI of Plaintiff's lumbar spine, with notes indicating multilevel lumbar spondylosis, mild to moderate central canal narrowing at L3-L4, and mild left lumbar scoliosis.  (Tr. 545)  Plaintiff was seen again on July 2, 2012.  The treatment notes indicate moderate distress, conservative treatment with medications, and interventional care with injections.  (Tr. 503, 632)  On August 16, 2012, Plaintiff received caudal epidural and trochanteric bursa injections.  (Tr. 541, 952)  On September 19, 2012, Plaintiff received a caudal epidural steroid injection.  Treatment notes from October 16, 2012, note that Plaintiff's back pain had improved with injections, refer her to physical therapy, and reflect that Plaintiff was active with swimming.  The October 16th notes indicate continued conservative

---

[1] The record includes treatment notes outside that time period, and the Court has reviewed the entire medical record.  Plaintiff is eligible for DIB benefits only during the period between October 31, 2011, and December 31, 2013.

care with medication and interventional care with injections.  (Tr. 500, 644)  Treatment notes from a follow-up visit on November 13, 2012, indicate that Plaintiff was in moderate distress, but had improved activity with at least a 50% reduction in pain.  (Tr. 499, 653)  On December 13, 2012, Plaintiff received caudal epidural and trochanteric bursa injections.  (Tr. 538)  The December 13, 2012, treatment notes indicate that Plaintiff was not in distress, and she denied any depression or anxiety.  (Tr. 966)

Throughout 2013, Plaintiff continued to receive conservative care in the form of medication management and interventional care in the form of injections.  By and large, but not always, this course of treatment provided substantial pain relief to Plaintiff.  Plaintiff was seen on March 27, 2013, more than three months after her prior reported visit in December 2012.[2] Plaintiff reported an 80% improvement in back pain and denied any depression or anxiety. Plaintiff received caudal epidural and trochanteric bursa injections.  (Tr. 531, 973)  During follow-up treatment on April 29, 2013, Plaintiff reported 80% relief and that her pain was at 2 out of 10.  (Tr. 491, 663)  On May 2, 2013, Plaintiff saw Dr. David Brown for an annual physical exam.  Dr. Brown's notes indicate that she was generally doing well.  (Tr. 449)  On July 2, 2013, Plaintiff requested a caudal injection, and on July 10, 2013, she received caudal epidural and trochanteric bursa injections.  (Tr. 488, 490, 531, 982)  During follow-up treatment on July 30, 2013, Plaintiff reported no relief from her July 10th injections, with her pain at 7-8 out of 10. (Tr. 486, 673)  On July 31, 2013, Plaintiff received caudal epidural and trochanteric bursa injections.  (Tr. 528, 992)  At her next reported visit, on September 24, 2013, Plaintiff reported that, after her prior injections, she had received 98% relief and that her pain was at 1 out of 10; she reported trying to exercise.  (Tr. 482, 685)  On November 18, 2013, Plaintiff saw Dr. Brown

---

[2] There are numerous indications in the record of telephone contacts with Plaintiff's providers between office visits and treatments.  Such contacts typically related to prescription management matters.

for a blood pressure check, hyperlipidemia, and anxiety; she requested Xanax. Dr. Brown's notes indicate "normal" findings for Plaintiff's eyes. (Tr. 444) On November 27, 2013, Plaintiff reported 65% improvement in lower back pain and received a caudal epidural injection. (Tr. 482, 526) During a telephone contact with Dr. Berry's office on December 11, 2013, Plaintiff reported a 60% improvement and requested an early medication refill, but during follow-up on December 12, 2013, Plaintiff reported no relief and that her pain was at 10 out of 10. (Tr. 481, 482, 696)

Although it is beyond her date last insured, the records from 2014 indicate that Plaintiff continued to receive conservative care via medication management and interventional care with injection therapy. Such care included trochanteric bursa injections and bilateral sacroiliac steroid injections every two or three months, which provided substantial relief. For example, on July 10, 2014, Plaintiff reported she had received 80% pain reduction and that her pain was at 2 out of 10.

### B.     Medical Evidence - Glaucoma

Plaintiff received treatment for glaucoma from Dr. Bruce Cohen, M.D., and Dr. Paul Tesser, M.D., Ph.D. The medical records indicate that Plaintiff's glaucoma worsened after her date last insured. For example, in June 2015, Dr. Tesser performed a surgical procedure on Plaintiff's left eye to provide drainage for uncontrolled glaucoma. (Tr. 411)

### C.     Opinion Evidence – Medical Source Statements (MSS)

Dr. Berry submitted a Medical Source Statement – Physical, dated December 18, 2016. (Tr. 1069-71) In his MSS, Dr. Berry represented that he began treating Plaintiff in approximately 2010. He listed Plaintiff's diagnoses as sacroiliitis, lumbar radiculopathy, and lumbar spondylosis/scoliosis. Dr. Berry indicated that Plaintiff suffered from low back and leg pain, noting she received lumbar epidural injections and sacroiliac joint injections. Dr. Berry indicated that Plaintiff's psychiatric condition did not exacerbate her perception of pain or other

symptoms. According to Dr. Berry, Plaintiff would likely miss work each month, but left blank on the form whether Plaintiff would miss one day or two or more days per month. Regarding the reasons Plaintiff would miss work, Dr. Berry indicated, "out of work since 2012 because of back pain." (Tr. 1070) Dr. Berry opined that Plaintiff would be off task 100% of the time during an eight-hour workday. Dr. Berry further opined that Plaintiff must use a cane to assist with walking and standing when her pain is severe. Dr. Berry restricted Plaintiff to five minutes of sitting but declined to explain the medical reasons for such a restriction. Dr. Berry also indicated that, for prolonged sitting, Plaintiff should elevate her legs to 30 degrees but did not specify any duration. Dr. Berry restricted Plaintiff to standing for five minutes, walking for ten minutes, and lifting up to 5 pounds, but again he did not provide any medical explanation for such restrictions. Dr. Berry opined that Plaintiff's impairments were permanent but left blank the earliest date his restrictions would apply to Plaintiff.

Dr. Cohen, Plaintiff's eye doctor, authored a Medical Source Statement – Vision, dated January 24, 2017. (Tr. 1122-24) Dr. Cohen began treating Plaintiff in March 2012. He noted diagnoses of advanced glaucoma, as well as prior glaucoma and cataract surgery in both eyes. Dr. Cohen assessed Plaintiff's corrected vision to be 20/20 (right) and 20/30 (left), with mild visual field loss in both eyes. Dr. Cohen indicated that Plaintiff's vision would frequently impact several work-related activities and limit certain abilities. Dr. Cohen also opined that Plaintiff had no significant limitations as of December 31, 2013. (Tr. 1124)

Dr. Tesser, Plaintiff's later eye doctor, also provided a Medical Source Statement – Vision, dated January 9, 2017. (Tr. 1073-75) Dr. Tesser indicated that he began treating Plaintiff in May 2015. He diagnosed Plaintiff with moderate glaucoma in her right eye and severe glaucoma in her left eye. Plaintiff retained visual acuity (after best correction) of 20/25 (right) and 20/40 (left), with full field in her right eye and severe restriction in her left eye. Dr.

Tesser provided specific opinions regarding Plaintiff's visual abilities relative to specific categories of work activities, but also stated that the "earliest date" of any restrictions was since his first exam of Plaintiff on May 8, 2015.  (Tr. 1074-75)

III.  **Administrative Hearing** **(Tr. 31-93)**

The ALJ held an administrative hearing on January 12, 2017.  Plaintiff appeared in person, with her attorney.  Vocational expert (VE) Gary Weimholt, M.S., also appeared by telephone.  At the outset of the hearing, the ALJ reviewed the record with counsel and agreed to leave the record open for two weeks so that Plaintiff could submit additional records from Dr. Cohen regarding Plaintiff's glaucoma.  Counsel explained that Plaintiff is disabled as a result of a combination of impairments, including glaucoma, anxiety, and back problems with radiculopathy.  Counsel explained that Plaintiff has been disabled since at least December 2013, noting that, in late-November 2013, Plaintiff switched from caudal injections to SI injections, indicating a need for stronger medication for relief.  (See Tr. 39-40)

Plaintiff testified regarding her work history, current and past activities, and relevant symptoms and limitations.  Plaintiff completed high school and some college.  Plaintiff previously worked at a family-owned funeral home in a small town.  Plaintiff performed a variety of duties, including picking up bodies, office work such as answering the phones and meeting with families, as well as scheduling and working at visitations and funerals.  She agreed that her work could be described as an "administrator" or "manager."  (Tr. 49)  Plaintiff left the funeral home business in 2004 after she and her husband divorced.  Plaintiff next worked for Gold's Gym and performed tasks such as handing out flyers, working at the desk, and stocking items such as water and protein drinks.

Regarding her back pain, Plaintiff testified that she used to be active but that she experienced back and hip pain.  She left her work at Gold's Gym as a result of her back

condition. She felt "miserable" when standing and could not sit in a chair that was "not a recliner" or where she could elevate her feet. (Tr. 55) Plaintiff testified that she went back to work at Gold's Gym briefly in 2011 in marketing. Plaintiff explained she would go to businesses to see if she could set up a box where customers could sign up for free memberships, but she had problems with that work due to "getting in and out of … the car and walking place-to-place." (Tr. 73)

Similarly, Plaintiff testified that her treatment providers told her to elevate her legs to relieve pressure. (Tr. 70) She testified that she began elevating her legs to relieve pain as far back as 2000, but started elevating her legs more often beginning in 2013. (Tr. 72) During her testimony at the hearing, Plaintiff explained that she was hurting physically in her lower back and hips and that her left hip was worse. Plaintiff testified at the hearing that she had been using a cane for a short time when she felt "unstable" but that she did not like using a cane. (Tr. 71)

Regarding her vision, Plaintiff testified that she is considered blind in one eye, she has to be cautious with her other eye, and that she has had multiple surgeries. Plaintiff explained that, although her vision was worse by the time of the hearing, she had problems with her peripheral vision in 2013. She testified about eye issues dating back to as early as 2002. She explained how her vision has been deteriorating over time.

Plaintiff testified that she takes Xanax to help her with anxiety that she experiences due to "not being able to do the things that [she] want[s] to do," and although her anti-anxiety medication "helps to a degree, … [she] is still emotional about … not being able to do what [she] should be able to do." (Tr. 68, 69)

Plaintiff testified that, although she became disabled in 2011, she waited until 2015 to apply for disability benefits because she was "embarrassed to ask for assistance," and "trying to get better during that time." (Tr. 65)

Vocational Expert Gary Weimholt testified regarding Plaintiff's past work and any transferrable skills she might have. Mr. Weimholt described Plaintiff's past work at a funeral home as a "combination job," in that she performed duties of a "funeral attendant" as well as an "administrative assistant." (Tr. 76) Mr. Weimholt described Plaintiff's past work at Gold's Gym as "a membership solicitor." (Tr. 77) He also explained that "the strongest level of any transferrable skills [came] from [Plaintiff's] administrative assistant work." (Tr. 79; see also Tr. 88-89)

Mr. Weimholt testified in response to several hypothetical questions that described a person having various combinations of limitations. As relevant here, Mr. Weimholt was asked to consider a hypothetical person who was – (1) limited to sedentary work, (2) could not climb ladders, ropes, or scaffolds, (3) could climb ramps or stairs occasionally, (4) could stoop, kneel, crouch, or crawl occasionally, (5) had no manipulative limitations, (6) would need to avoid exposure to unprotected heights or hazardous machinery, and (7) would be absent from work about one day per month. (Tr. 80, 82) Mr. Weimholt opined that such limitations would be consistent with an administrative assistant job. (Tr. 82) He also identified the following specific representative jobs that such a person could perform: customer complaint clerk; customer service representative; and order clerk. (Tr. 82-83)

## IV. ALJ's Decision (Tr. 15-25)

In a decision dated April 6, 2017, an ALJ concluded that Plaintiff was not disabled under the Act, and thus not entitled to disability insurance benefits for the time period covering her alleged disability onset date of October 31, 2011, through her date last insured of December 12, 2013. The ALJ followed the five-step, sequential process in evaluating Plaintiff's claim. At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity during the

relevant timeframe. At step two, the ALJ found that Plaintiff had a severe impairment consisting of degenerative disc disease.

The ALJ found Plaintiff's glaucoma to be a non-severe impairment. In the decision, the ALJ found that the records from the relevant time period indicated that Plaintiff's glaucoma caused no more "than minimal limitations in [Plaintiff's] ability to perform basic work activities," highlighting that treatment notes from March 2014 indicated that Plaintiff's vison was stable and requiring six-month follow-up. (Tr. 17) In assessing the severity of Plaintiff's glaucoma during the relevant timeframe, the ALJ also considered the medical evidence and opinions of Drs. Cohen and Tesser. The ALJ gave Dr. Cohen's MSS great weight because it was consistent with the limited record and based on a long treatment history, highlighting that Dr. Cohen found no significant limitations as of December 31, 2013. (Tr. 18) The ALJ gave no weight to Dr. Tesser's MSS because it did not encompass the relevant time frame. (Id.)

The ALJ found Plaintiff's reported depression and anxiety also caused no more than minimal limitations to her ability to perform basic mental work and, therefore, were non-severe impairments. The ALJ pointed out that, while Plaintiff's dosage of Xanax increased in May 2013, that increase was attributed to her illness, not anxiety, and that most of the treatment notes regarding Xanax are found in the records beyond her date last insured. The ALJ also found that Plaintiff had no limitation in the areas of understanding, remembering, or applying information; interacting with others; and adapting or managing oneself. Regarding concentration, persistence, or maintaining pace, the ALJ found that Plaintiff exhibited only mild limitations.

Regarding listings, the ALJ found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled any listing.

Based on the entire record, the ALJ concluded that Plaintiff had retained the residual functional capacity ("RFC") to perform sedentary work, with the following additional limitations

noted: (1) she could occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds; (2) she could occasionally stoop, kneel, crouch, and crawl; (3) she could never work at unprotected heights or around moving mechanical parts; and (4) she would be expected to be absent from work one day each month. (Tr. 19) In determining Plaintiff's RFC, the ALJ summarized the relevant medical record and opinion evidence. The ALJ also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 20) Regarding Plaintiff's pain, the ALJ found that Plaintiff did not generally receive "the type of medical treatment one would expect for a totally disabled individual. She was treating monthly with her pain management physician who followed a conservative course of treatment with pain medication, physical therapy, aqua therapy and steroid injections." (Tr. 22) The ALJ noted that this course of treatment was "generally successful in controlling [her] symptoms during the time period at issue. Nearly every note of visit with Dr. Berry showed that the treatment regimen was successful in alleviating her symptoms." (Id.) Similarly, the ALJ found that Plaintiff's daily activities were not as limited as one would expect, given Plaintiff's "complaints of disabling symptoms and limitations." (Id.)

The ALJ specifically considered Dr. Berry's MSS, dated December 18, 2016. The ALJ gave that opinion no weight because it did not relate back to the relevant time period of October 31, 2011, to December 31, 2013. The ALJ further explained that Dr. Berry's objective findings and treatment notes from that time period show that his treatment was successful in that it alleviated Plaintiff's pain and allowed her to engage in daily activities. (Tr. 23)

At step four, and in consideration of the VE's testimony, the ALJ found that Plaintiff was not able to return to her past relevant work. The ALJ found Plaintiff to be of advanced age as of her date last insured, with at least a high school education and work skills that she had acquired

from her past relevant work, including skills associated with her work as an administrative assistant.

At step five, based on Plaintiff's age, education, work experience, work skills, and RFC, and in view of expert testimony from the VE, the ALJ found that Plaintiff could perform work that existed in substantial numbers in the national economy, namely customer complaint clerk, customer service clerk, and order clerk. Each of these representative occupations was sedentary, and skilled or semi-skilled. Accordingly, the ALJ concluded that Plaintiff was not disabled during the relative time period.

## Analysis

### I.     Issues Presented for Review

In her brief, Plaintiff lists two issues for review. Both issues ultimately involve the ALJ's RFC assessment. Overall, Plaintiff argues that the ALJ did not properly determine her RFC, contending that the record does not contain "any medical evidence that addresses [her] ability to function in the workplace and that supports the [ALJ's] RFC assessment." (ECF No. 12 at 3) Plaintiff further contends that the ALJ erred in weighing the relevant opinion evidence and in assigning no weight to the opinion of Dr. Berry, Plaintiff's pain management provider. Plaintiff contends that, based on the record in her case, there were "significant, objective findings and evidence which would require a medical opinion to determine [her] ability to function in the workplace." (ECF No. 12 at 5)

### II.    Standard of Review and Analytical Framework

To be eligible for DIB benefits, a claimant must prove that she is disabled within the meaning of the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, the ALJ follows a five-step process in determining whether a claimant is disabled. "During this process the ALJ must determine: '1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not 5) whether the claimant can perform any other kind of work.'" Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015) (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)). "If, at any point in the five-step process the claimant fails to meet the criteria, the claimant is determined not to be disabled and the process ends." Id. (citing Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)); see also Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011).

A district court's review of an ALJ's disability determination is intended to be narrow and courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a

reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016); Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The claimant's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the claimant's impairments.

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016); McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the

Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## III. Discussion

Plaintiff asks this Court to review two related issues concerning the ALJ's RFC assessment. Plaintiff contends that the record does not contain medical evidence that supports the ALJ's RFC assessment. Plaintiff contends that, based on the record of this case, a medical opinion is required to assess her ability to function in the work place (ECF No. 12 at 5), and that the ALJ erred in weighing the relevant opinion evidence and in assigning no weight to the opinion of Dr. Berry, her pain management provider.[3]

The Eighth Circuit has explained that

> [a claimant's] RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Although it is the ALJ's responsibility to determine the claimant's RFC, 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her RFC. Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015). The RFC determination must be supported by some medical evidence. Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013).

Buford v. Colvin, 824 F.3d 793, 796 (8th Cir. 2016); see also Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011). "'Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the

---

[3] Plaintiff has not directly challenged the ALJ's adverse credibility finding. In contesting the ALJ's weighing of opinion evidence, Plaintiff notes that the ALJ should have credited Plaintiff's treatment compliance (e.g., exercise, physical therapy, and swimming) as enhancing her credibility, rather than treating her treatment compliance as activities of daily living. The undersigned finds the ALJ complied with the strictures of Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), and there is substantial evidence in the record to support the ALJ's analysis of Plaintiff's credibility. A review of the ALJ's decision shows she discredited Plaintiff's subjective complaints for good reason and thoroughly discussed her reasons for doing so. See Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (explaining that "[c]redibility determinations are the province of the ALJ" and the deference owed to such determinations); Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination").

workplace…. Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively.'" Harvey v. Colvin, 839 F.3d 714, 717 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).

There is no requirement that an ALJ's RFC assessment be supported by a specific medical opinion. See Hensley v Colvin, 829 F.3d 926, 931-32 (8th Cir. 2016). And even if there is a medical opinion from a treating source, that opinion is not automatically entitled to controlling or even significant weight. "[T]he Commissioner's regulations … provide that a treating physician's opinion is given controlling weight if, and only if, it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" Johnson v. Astrue, 628 F.3d 991, 994 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ can discount a treating physician's opinion if, for example, that opinion is based on subjective complaints more than objective medical evidence. See Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016) (citing Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014)); see also Vance v. Berryhill, 860 F.3d 1114 (8th Cir. 2017) (affirming ALJ decision even where the source's opinion was based only partially on the claimant's subjective complaints). An ALJ need not give controlling weight to a treating physician's opinion where there is an absence of clinical findings to support the opinion, if it is inconsistent with treatment notes, or if the opinion is vague, conclusory, or in an unexplained checklist format. See Boyd v. Colvin, 831 F.3d 1015, 1021 (8th Cir. 2016) (citing cases); Andrews v. Colvin, 791 F.3d 923 (8th Cir. 2015); McCoy v. Astrue, 648 F.3d 605 (8th Cir. 2011); Johnson, 628 F.3d at 994 (8th Cir. 2011); Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). And it is well-established that an ALJ may give no deference to a treating source's opinion that a claimant is disabled or cannot be employed because such determinations are reserved to the Commissioner. See Perkins v. Astrue, 648 F.3d 892, 898 (8th Cir. 2011) (citation omitted).

As outlined above, Dr. Berry provided an MSS, dated December 18, 2016, in which he opined that Plaintiff was permanently disabled. The ALJ assigned no weight to this opinion and provided three reasons for doing so. First, the ALJ found that the opinion did not relate back to the relevant time frame—October 31, 2011, through December 31, 2011. Second, the ALJ found that Dr. Berry's own findings during the relevant time period did not support the opinion. Third, the ALJ found that Dr. Berry's treatment during the relevant time frame was successful in alleviating Plaintiff's pain, "allowing her to engage in regular daily activities." (Tr. 23)

Plaintiff argues that the ALJ failed to properly explain the basis for giving no weight to Dr. Berry's opinion inasmuch as the three reasons provided are not supported by the Record. (ECF No. 12 at 7, 8) Plaintiff emphasizes that Dr. Berry's opinion did, in fact, relate back to the time period in question—October 2011 to December 2013—because Dr. Berry noted that "Plaintiff had not worked in four (4) years, which would have been approximately 2012, and since that time, she has had permanent impairments." (ECF No. 12 at 8) Plaintiff also cites several examples from the treatment notes during the relevant time frame, implying that those notes support a finding of disability during the relevant time frame.[4]

Plaintiff's argument cannot be sustained on this record. Dr. Berry's MSS was completed in a fill-in-the-blanks format. In question 14, he was asked, "Have your patient's impairments lasted or can they be expected to last at least twelve (12) continuous months?" In response, Dr. Berry wrote, "She has over 4 years not worked expect permanent impairment." (Tr. 1071) In

---

[4] To the extent Plaintiff's arguments might be read to imply that the ALJ erred because the RFC is not based on any medical opinion, such an argument alone would not entitle Plaintiff to remand in this case. See Martise, 641 F.3d at 923 (explaining that, when determining a claimant's RFC, an "'ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians'") (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)).

question 15, Dr. Berry was asked "What is the **earliest date** that the above limitations apply?" (Id., emphasis in original)  Dr. Berry did not provide a response to question 15.

The ALJ's finding that Dr. Berry's MSS did not relate back is supported by the language of the MSS itself.  Dr. Berry identified several limitations relative to Plaintiff's ability to function in the work place, but his opinion was prepared almost three years after Plaintiff's date last insured.  When asked to opine when those limitations would have applied, Dr. Berry declined to answer.  Similarly, when asked to opine whether Plaintiff would miss one work day per month or two or more work days per month, Dr. Berry declined to answer.

Plaintiff correctly notes that Dr. Berry stated Plaintiff had not worked in over four years and that she could expect permanent impairment, but that statement does not equate to a finding that her limitations were as severe prior to her date last insured as they were three years later when Dr. Berry completed the MSS form.  The record makes clear that even Plaintiff did not believe all of the limitations applied to her as of December 2013.  For example, in his MSS, Dr. Berry opined that Plaintiff required the use of a cane.  (Tr. 1070)  As late as January 2017, Plaintiff testified that she had only used a cane for a short period of time and did not like to use it regularly.  (Tr. 71)  Additionally, to the extent Dr. Berry's statement regarding permanent impairment amounted to an opinion on the issue of disability, the ALJ had no duty to credit that statement at all.  See Perkins, 648 F.3d at 898.  Accordingly, the ALJ did not err in finding that Dr. Berry's MSS did not cover the relevant time period.

Although Dr. Berry did not answer the question of when Plaintiff's impairments became work-limiting, the ALJ considered the entire medical record in assessing Plaintiff's RFC and found that Dr. Berry's treatment records during the relevant time period were not consistent with

his MSS.[5]  Relatedly, the ALJ found that Dr. Berry's treatment was successful in alleviating Plaintiff's pain.  Based on the Court's independent review of the medical record, the undersigned finds that the ALJ did not err in this finding and that substantial evidence supports the ALJ's RFC assessment.

The medical record, which is summarized above, shows that Plaintiff's primary impairment was pain-related and that Dr. Berry routinely addressed Plaintiff's back and hip pain with a mix of conservative and interventional care.  The record also shows that the treatment provided significant relief most of the time, and when it did not, immediate follow-up treatment provided relief.  Overall, the record shows that, during the relevant time period, Plaintiff required treatment less often than once-per-month on average.  The RFC articulated by the ALJ specifically accounted for the possibility that Plaintiff would miss work once-per-month to receive treatment.  Further, there are no indications of limitations placed on Plaintiff by Dr. Berry which would be consistent with total disability.  Rather, the record indicates that Plaintiff was encouraged to continue exercising and engaging in physical therapy.  Thus, there is adequate medical evidence in the record as a whole to support the ALJ's findings relative to Plaintiff's ability to function in the workplace.

To be sure, Plaintiff has highlighted several specific examples in the record where treatment notes indicate she needed medical care to alleviate pain.  For example, Plaintiff notes that on December 11, 2013, she called in for an early refill of Percocet and Dr. Berry set an appointment for the next day.  On December 12, 2013, Plaintiff was noted to be in moderate distress and she reported her pain at 10 out of 10.  Dr. Berry prescribed an early refill and increased dosage of Percocet and a patch to treat her pain.  (ECF No. 12 at 10; see also Tr. 481,

_____

[5] In particular, the ALJ stated that, "the objective findings made by Dr. Berry during the relevant time period do not reveal sufficient medical findings."  (Tr. 23)

482, 696)  Plaintiff omits, however, that Dr. Berry's treatment notes also reflect that on December 11, 2013, she reported her pain at 60 percent better.  (Tr. 482)  The ALJ specifically noted this discrepancy in Plaintiff's self-reporting of her pain in assessing Plaintiff's RFC.  (Tr. 22)  Plaintiff argues that, by December 2013, the relief she received from treatment was "short lived" and that she was unable to work by that time.  (ECF No. 12 at 11)  But the medical record for the time period in early 2014, as recounted above, lends additional support to the ALJ's decision that Dr. Berry's course of treatment—conservative treatment with medication and interventional treatment with injections—provided substantial relief for Plaintiff's pain.  For example, in January 2014, Plaintiff reported that her pain had improved, and in February she reported that she was continuing her exercise program and reported improved activity.  (Tr. 454, 524, 1007, 705)  Over the first half of 2014, Plaintiff continued to receive treatment from Dr. Berry less than once-per-month.  And in treatment notes from July 10, 2014, Plaintiff reported her pain at 2 out of 10 and an 80% pain reduction with her treatment.  (Tr. 764)  Thus, the record does not compel a finding that Plaintiff was disabled as of December 2013.  The record provides substantial support for a contrary finding.

In summary, the administrative record, when considered as a whole, supports a conclusion that Plaintiff was capable of work at the sedentary level, with the additional limitations identified by the ALJ.  The record also supports the ALJ's decision to discount the opinions contained in Dr. Berry's MSS.  The fact that the record might also support contrary conclusions is not a basis for reversing the ALJ's decision in this case.  See Reece, 834 F.3d at 908; McNamara, 590 F.3d at 610.

## Conclusion

For the foregoing reasons, Plaintiff's argument that the ALJ erred in formulating her RFC and addressing the opinion evidence in this case cannot be sustained.  The ALJ's decision

regarding Plaintiff's RFC is supported by substantial evidence, and because that decision falls within the reasonable "zone of choice," it will not be disturbed.  See Buckner, 646 F.3d at 556.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.  A separate Judgment shall be entered this day.

 /s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of  February, 2019.